IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | : | Case No. 1:13cr016 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER DENYING MOTION TO SEVER** |
| | : | **COUNTS AND MOTIONS TO DISMISS THE** |
| **JAMES NAPIER**, | : | **INDICTMENT** |
| | : | |
| Defendant. | : | |

Defendant James Napier is charged in a twelve-count superseding indictment with the production, transportation, distribution, and receipt of child pornography in violation of 18 U.S.C. § 2251(a) and (e), § 2252(a)(1) and (b)(1), and § 2252(a)(2) and (b)(1). (*See* Doc. 46.) Now before the Court are several motions filed by the Defendant: Motion for Severance of Counts 2–9 of the Superseding Indictment (Doc. 51), Motion to Dismiss Indictment Pursuant to the Speedy Trial Act (Doc. 52), Motion to Dismiss Counts 1–9 of the Superseding Indictment (Doc. 53), and Motion to Dismiss Indictment (Doc. 54). The Government has opposed the motions. For the following reasons, the Court DENIES each of Defendant's motions.

I.      BACKGROUND

On January 16, 2013, the Government filed a criminal complaint against James Napier charging child pornography offenses. The affidavit of the FBI agent making the complaint detailed the Bureau's investigation into matters that eventually lead them to Napier. Beginning in 2010, an undercover agent observed a website advertising the sale of child pornography. The agent corresponded with an individual via email who eventually sent the agent an email with an attached video of minor females engaged in sexual acts. The agent, using open-source internet

and later a consumer reporting database, eventually identified the sender of the video as James Napier. The subsequent investigation and forensic analysis of a computer used by Napier revealed child pornographic images including those of a child victim aged approximately eleven months old.

On January 18, 2013, Napier made his initial appearance on the criminal complaint. Then, on February 6, 2013, Napier was indicted in a twenty-three count indictment. Count 1 charged Napier with producing child pornography involving an eleven-month-old victim on or about November 6, 2009. Counts 2 through 20 charged Napier with producing child pornography involving a nine-year-old victim on numerous occasions between August and November, 2012. The indictment further charged Napier with transportation, distribution, and receipt of child pornography. The Court scheduled a trial to commence on April 8, 2013.

On March 15, 2013, by and through counsel, Napier filed a motion to continue the motions deadline and trial date. The Court granted the motion, extending the motions deadline to April 12, 2013 and resetting the trial for May 13, 2013. In a written order, the Court excluded the days between the original trial date of April 8, 2013 and the new trial date of May 13, 2013, from the speedy trial calculation. (*See* Doc. 34.)

On April 12, 2013, by and through counsel, Napier filed a motion for a psychiatric evaluation. The Court granted the motion on April 29, 2013. Thereafter, Napier was transported to the Metropolitan Correctional Center in Chicago, Illinois, to undergo a psychiatric evaluation.

In June 2013, the Court received a letter from the Office of the Warden of the Metropolitan Correctional Center requesting an extension of time to August 9, 2013 to complete Napier's testing and examination. The Court granted the request on June 10, 2013. On September 10, 2013, the Court received forensic reports from the Metropolitan Correction

Center addressing the issues of Napier's trial competence and criminal responsibility.  The Court set a competency hearing for October 2, 2013.

On October 2, 2013, the federal grand jury returned a superseding indictment.  The superseding indictment did not change the substance of the charges but combined the production counts that had been charged in counts 2–20, involving the nine-year-old victim into counts 2–9. Count 1, involving the eleven-month-old victim, remained the same, and the counts that formerly were 21–23 become counts 10–12 in the superseding indictment.  Also on October 2, 2013, the Court held a competency hearing and arraignment on the superseding indictment. Napier pleaded not guilty to all counts, and the Court found him competent to stand trial.  The Court set a new motions deadline of October 11, 2013 and scheduled trial for December 11, 2013.  In a written order, the Court excluded from the speedy trial calculation the days between the October 2, 2013 competency hearing and the motions deadline of October 11, 2013.

On October 11, 2013, Napier filed the pending four motions, thereby tolling the speedy trial clock.

## II.  DISCUSSION

### A.  Motion for Severance

Defendant Napier argues in this motion that counts 2–9 were not properly joined in the indictment with count 1 and, accordingly, they should be severed and tried before a separate jury.  He further argues that his defense would be prejudiced if all the counts were tried together.

Two procedural rules address the issue of joinder of charges in an indictment.  First, Rule 8(a) of the Federal Rules of Criminal Procedure provides, "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with

or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).  Second, Rule 14(a) provides that, even if counts are properly joined under Rule 8(a), they may be severed if the defendant is prejudiced by the joinder.

### 1.  Rule 8(a): Was Joinder Proper?

Napier contends that the counts are not properly joined because count 1 involves a different and significantly younger child victim than counts 2–9, and the offense in count 1 arose almost three years before the offenses in counts 2–9.  He cites for support the case of *United States v. Chavis*, 296 F.3d 450 (6th Cir. 2002), wherein the defendant was charged with making false statements to a firearms dealer and with possession of crack cocaine.  The Sixth Circuit held that the district court erred in permitting joinder of the two offenses because they were not connected temporally, by a common scheme, or in terms of the evidence necessary to prove the offenses.

The Government argues that joinder was proper because the offenses charged are of the same or similar character, which is the requirement of Fed. R. Crim. P. 8(a).  Specifically, count 1 charges the production of child pornography on a certain date, and counts 2-9 charge the production of child pornography on other dates.  The Government cites cases where courts properly joined same offenses.  *See, e.g., United States v. Tran*, 433 F.3d 472, 477–78 (6th Cir. 2006) (two arson offenses); *United States v. Archer*, 843 F.2d 1019, 1021 (7th Cir. 1988) ("[B]oth counts charge Archer with possessing prohibited objects with the intent to facilitate an escape from prison.  The elements to be proved in each case were the same.  This similarity supports the district court's decision of joinder.")

The Government's position is more compelling.  All counts charge offenses of production of child pornography and are thus offenses of the same or similar character.  Joinder was proper.

### 2.  Rule 14: Is Joinder Prejudicial?

Napier next contends that he will be unduly prejudiced by the joinder.  Count 1 involves an alleged eleven-month-old victim who was video recorded in November 2009.  The charges in counts 2-9 involve an unrelated nine-year-old victim who was video recorded in July and September of 2012.  Napier argues that if the jury hears evidence of the production of child pornography from counts 2-9 during the trial of count 1, he would be unduly prejudiced because the evidence that he allegedly videotaped the nine-year-old would be improperly considered by the jury as propensity evidence, making conviction much more likely.

In order to prove prejudice in the joinder of offenses, a defendant must show that the joinder would "compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence."  *Tran*, 433 F.3d at 478 (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

Whether to grant a motion to sever under Criminal Rule 14 is within the sound discretion of the district court, and the decision will not be disturbed absent an abuse of that discretion.  *Id*. To establish an abuse of discretion, the defendant must make "'a strong showing of prejudice.'" *Id*. (quoting *United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir. 1985)).  In *Tran*, the Sixth Circuit held that the district court did not abuse its discretion when it refused to grant the defendant's motion to sever two counts of arson: one arising out of a fire in Kentwood, MI in 2000 and another arising out of a fire in Wyoming, MI in 2002.  The defendant was found guilty

of both counts, but she was unable to show "substantial prejudice," even though evidence spilled over from one offense to the other. *Id.*

Napier's argument that the jury will be unable to make a reliable determination of guilt if the counts are tried together is not persuasive. The Court routinely instructs juries on how to consider evidence separately for each count, and there is no reason to suspect that the jury would not be able to follow those instructions in this case. Defendant has not presented adequate grounds to support a conclusion that joinder is unduly prejudicial in this case, and his motion for severance is DENIED.

### A. Motion to Dismiss Pursuant to the Speedy Trial Act

The Speedy Trial Act requires that "the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). In this case, the parties agree that the speedy trial clock began on February 6, 2013, the date on which the indictment was filed.[1]

A defendant can make a *prima facie* showing of a violation of the Speedy Trial Act by "producing a calendar and showing that more than 70 days have passed since the Indictment . . . and the trial has not yet begun." *United States v. Jenkins*, 92 F.3d 430, 438 (6th Cir. 1996). Once the defendant establishes a *prima facie* violation, the government has the burden of proving excludable time by a preponderance of the evidence. *Id.*

---

[1] The day of the indictment, as well as the day of the arraignment, are excluded from the speedy trial calculation. *United States v. Mentz*, 840 F.2d 315, 326 (6th Cir. 1988) (citing *United States v. Severdija*, 723 F.2d 791, 793 (11th Cir. 1984) (day of indictment excluded); *United States v. Monroe*, 833 F.2d 95, 99 (6th Cir. 1987) (day of arraignment excluded).

The Speedy Trial Act includes numerous provisions which exclude certain periods of delay from the seventy-day calculation.  Three such provisions are relevant in this case: those excluding any period of delay resulting from (1) "any proceeding, including any examinations, to determine the mental competency" of the defendant; (2) "any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;" and (3) "delay resulting from transportation of any defendant from another district, or to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable."  (18 U.S.C. § 3161(h)(1)(A), (D), and (F)).

Defendant easily has met his prima facie case of showing a violation of the Speedy Trial Act: he was indicted on February 6, 2013, and more than ten months have passed.  However, certain portions of time are properly excluded pursuant to the above exclusions.  The parties dispute how much time is properly excluded.

Napier argues in this motion that the seventy-day speedy trial clock expired on September 7, 2013.  He calculates the time as follows:

| Time elapsed on clock | Time tolled on clock | Total elapsed time |
|---|---|---|
| February 6–March 15, 2013 (36 days) | | 36 days |
| | March 15–May 9 (motion to continue, motion for exam, 10 days to transport from 4/29) | 36 days |
| May 10–May 24, 2013 (15 days) | | 51 days |
| | May 24–Aug. 19 (conduct exam + 10 days for transport) | 51 days |
| Aug. 20–Sept. 7, 2013 (19 days) | | 70 days: clock expires Sept. 7, 2013 |

According to Napier and as set forth in the above table, the clock started on February 6, 2013 and stopped on March 15, 2013 when he filed a motion to continue the motions deadline and trial by one month.  The Court granted this motion and extended the motions deadline from March 15, 2013 to April 12, 2013.  The clock thus remained stopped until April 12, 2013 when Napier filed another motion—this one requesting a psychiatric evaluation.  The Court granted that motion and, in an order filed April 29, 2013, directed that Napier be transported for the evaluation.  (Doc. 40.)  According to Napier, the clock remained tolled until that date and then for another ten days, or until May 10, 2013, pursuant to the transportation exclusion, 18 U.S.C. § 3161(h)(1)(F).[2]

Napier did not arrive at the place of examination, MCC Chicago, until May 24, 2013, twenty-five days after the Court granted the motion for a psychiatric evaluation.  According to Napier, only ten of those twenty-five days for transportation were excluded from the speedy trial calculation, thus fifteen days elapsed from the clock.  The Government does not dispute this.

Napier states that the clock again stopped on May 24, 2013, the date on which Napier arrived at MCC Chicago for his evaluation, and that it remained stopped pursuant to the examination exclusion, 18 U.S.C. § 3161(h)(1)(A),[3] until August 9, 2013, the date the Court ordered Napier's evaluation to be completed. (*See* Doc. 41.)  Napier then "assumes without agreeing" that another ten days were tolled, from August 9 until August 19, 2013, for the transportation of Napier back to the Southern District of Ohio for his competency hearing.  According to Napier, as of August 19, 2013, fifty-one days had passed on the speedy trial clock,

---

[2] This provision excludes "delay resulting from transportation of any defendant . . . to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable."  18 U.S.C. § 3161(h)(1)(F).

[3] This provision excludes from the speedy trial calculation "any proceeding, including any examinations, to determine the mental competency" of the defendant.  18 U.S.C. § 3161(h)(1)(A).

leaving only nineteen days.  Under this theory, the seventy days in which to bring Napier to trial

expired on September 7, 2013.

Except for three specific days, the Government does not dispute Napier's speedy trial

computation up to August 2013.  The Government agrees that the clock started on February 6,

2013, the date of Napier's indictment, and that it ran until March 15, 2013, the date of Napier

filed a motion to continue. [4]  However, the Government excludes three days from that timeframe:

(1) February 11, 2013, the day on which Napier was arraigned; (2) February 13, 2013, the day on

which the Court conducted a status conference; and (3) February 20, 2013, the day on which the

Government filed, and the Court granted, a motion for protective order.  The Government

contends that the first two of these dates are excluded under 18 U.S.C. § 3161(h)(1) as "[a]ny

period of delay resulting from other proceedings concerning the defendant."  *See also United*

*States v. Mentz*, 840 F.2d 315, 326 (6th Cir. 1988) (excluding the day of the indictment and the

arraignment); *United States v. Lucky*, 569 F.3d 101, 107 (2d Cir. 2009) (excluding the day of a

status conference).  It contends that the third date, February 20, 2013, is excluded under 18

U.S.C. § 3161(h)(1)(D) as a delay resulting from any pretrial motion.  Napier has not disputed,

either in a responsive memorandum or during the oral argument on the motions, that these three

dates are properly excludable.  Based on the legal precedent cited by the Government, the Court

agrees that these three days should be excluded from the seventy-day speedy trial computation.

Thus, as of March 15, 2013, thirty-three days of the seventy days had elapsed.

The Government and Napier are in agreement that the clock stopped on March 15 due to

Napier's filing of a motion to continue and that it remained stopped until May 9, 2013.  The

clock was stopped during this timeframe because of an ends of justice order entered by the

---

[4] Although the speedy trial clock began to run on February 6, 2013, the day of the indictment is excluded from the calculation.  *United States v. Mentz*, 840 F.2d 315, 326 (6th Cir. 1988).

Court, Napier's motion requesting a competency hearing (which was granted on April 29, 2013), and ten days for transportation to the place of Napier's evaluation. The clock resumed on May 10, 2013 and stopped again on May 24, 2013, the date Napier arrived at MCC Chicago for his competency evaluation. At that point, the tally on the clock was forty-seven days.

The significant dispute between the parties with respect to the computation of speedy trial time begins at this point: it concerns the amount of time excludable as a result of Napier's psychological examination and subsequent transportation back to the Southern District of Ohio. The period of delay resulting from "any proceeding, including any examinations, to determine the mental competency" of the defendant is excluded under 18 U.S.C. § 3161(h)(1)(A). Napier contends that the exclusion of time under that statutory provision ended August 9, 2013, the date on which this Court ordered Napier's examination to be complete. He argues that the next ten days are excluded for the purpose of transporting Napier back to the Southern District of Ohio for his hearing, and that no other exclusions apply. If this were correct, seventy days would have elapsed on September 10, 2013.

The Government argues that the clock did *not* begin on August 9, 2013. Rather, it argues either that (1) the clock never restarted after the competency examination, in which case forty-seven days have elapsed on the speedy trial clock; (2) the clock began to run on September 16, 2013, ten days after the agency ordered Napier's transportation back to the Southern District of Ohio from the place of examination, in which case fifty-seven days have elapsed; or (3) the clock began to run on September 9, 2013, ten days after the doctor wrote a note indicating that Napier could be transported back from the place of examination, in which case sixty-four days have elapsed. Under any scenario, the speedy trial clock stopped on October 2, 2013, the date of Napier's competency hearing and arraignment on the superseding indictment. It has remained

stopped since that date: the Court entered an "Ends of Justice" order on October 3, 2013 to allow Defendant time to prepare pre-trial motions, and Defendant filed multiple motions on October 11, 2013, which kept the clock stopped.

The Court must turn to case law to resolve the question of when the clock resumed following Napier's competency evaluation. Napier's use of the August 9, 2013 date for restarting the clock after Napier's competency evaluation relies on the Court's June 10, 2013 order, which granted the Warden's request for "an extension to complete the testing and examination necessary to develop a history, diagnosis, and opinion of the defendant until August 9, 2013." Napier does not cite any authority for his conclusion that the speedy trial clock began to run again on that date.

According to the Government, there is no authority to support Napier's position that the clock began again on August 9, 2013. As the Government notes, subsection (h)(1)(F) of the Speedy Trial Act excludes "delay resulting from the transportation of any defendant . . . to and from places of examination or hospitalization, except that any time consumed in excess of ten days *from the date of an order . . . directing such transportation*, and the defendant's arrival at the destination shall be presumed to be unreasonable." 18 U.S.C. § 3161(h)(1)(F) (emphasis added). Thus, the ten-day transportation exclusion begins from the date of an order directing such transportation. As the Government points out, no order directing Napier's transportation from the place of examination was issued by this Court. Thus, there was no trigger for the so-called transportation exclusion.

The question, then, is when did the clock begin to run again? To answer this question, the Court must determine the duration of the exclusion occasioned by Napier's psychiatric evaluation, as the Act excludes the "delay resulting from any proceeding, including any

examinations, to determine the mental competency or physical capacity of the defendant."  18

U.S.C. § 3161(h)(1)(A).  Again, Napier contends that the exclusion ended on August 9, 2013, the

date by which this Court ordered Napier's evaluation to be completed.  However, case law does

not support that contention.

Numerous courts have held that the period of excludable delay under § 3161(h)(1)(A)

begins when a party moves for a competency evaluation and continues until at least a

competency hearing is held.  In *United States v. Graves*, the Third Circuit concluded that "the

period between a request for a competency examination and a hearing addressing that issue is

clearly part of the 'delay resulting from any proceeding . . . to determine the mental competency

or physical capacity of the defendant,' and therefore is 'excluded . . . in computing the time

within which the trial . . . must commence.'" 722 F.3d 544, 548 (3d Cir. 2013) (quoting 18

U.S.C. § 3161(h)(1)(A)).  In reaching its decision, the *Graves* Court relied on decisions from the

First, Second, Fifth, and Sixth Circuits, the most recent of which was the Sixth Circuit's opinion

in *United States v. Tinklenberg*, 579 F.3d 589 (6th Cir. 2009), *aff'd on other grounds*, 131 S. Ct

2007 (2011).  In *Tinklenberg*, the Sixth Circuit stated that "all delays caused by proceedings to

determine a defendant's competency are excluded, except for the time during which the

defendant is supposed to be in transit, which is presumptively unreasonable if longer than ten

days."  *Id*. at 596.  Thus, setting aside for a moment the issue of transportation, the weight of

authority holds that a motion for a competency evaluation stops the clock until the date the court

rules on the defendant's competency.  *See Graves*, 722 F.3d at 548–49, citing *United States v.

Stephens*, 489 F.3d 647, 653 (5th Cir. 2007) ("[T]he district court correctly concluded that [the

defendant's] motion for a competency evaluation stopped the clock from the date it was filed . . .

through the date the court ruled that [he] was competent to stand trial. . . .");  *United States v.*

*Noone*, 913 F.2d 20, 25–26 (1st Cir. 1990) (excluding the "entire period" from when the motion to determine competency was filed through the date of the competency ruling, other than an unreasonable delay in transporting the defendant to the competency examination); *United States v. Vasquez*, 918 F.2d 329, 333 (2d Cir. 1990) ("Since the delays here complained of by [the defendant] arose from proceedings to determine his competency and were prior to the conclusion of the hearing thereon, they must be excluded from the calculation of the speedy trial clock whether or not they are reasonable.").  Based on this precedent, the Court concludes that the period of time between the date Napier filed his motion seeking a competency evaluation, April 12, 2013, and the date on which the Court held a competency hearing and determined Napier to be competent, October 2, 2013, must be excluded from the speedy trial calculation *except* any unreasonable delay in transporting him.  *See Tinklenberg*, 579 F.3d at 596.

Turning now to the issue of transportation, fourteen days of the speedy trial clock elapsed during Napier's transportation to his competency evaluation:  The Court granted Napier's motion for a competency evaluation and directed his transportation on April 29, 2013, and the competency evaluation commenced, May 24, 2013.  Pursuant to § 3161(h)(1)(F), ten days were excluded for transportation between those dates and fourteen days of the speedy trial clock elapsed.  The Court must now determine how many speedy trial days elapsed during Napier's transportation back to the Southern District following his competency evaluation.  If the delay resulting from his return transportation consumed in excess of ten days, those additional days shall be presumed to be unreasonable.

Sixth Circuit precedent is not entirely clear as to when the transportation clock begins to run where there is no judicial order directing such transportation.  In *United States v. Turner*, 602 F.3d 778 (6th Cir. 2010), the Sixth Circuit recognized that "even without such an order, we still

could start the clock at the start of the defendant's trip or on the date of an agency's internal

order to transport" and noted that the Seventh Circuit has followed such an approach.  *Id*. at 785

(citing *United States v. Garrett*, 45 F.3d 1135, 1139–40 (7th Cir. 1995)).  However, the court did

not have to decide the matter because a judicial transportation order existed in that case.  In

*Tinklenberg*, the court counted transportation time from the defendant's designation date, but it

did not supply any analysis in explanation of that decision.  *Tinklenberg*, 579 F.3d at 597.

The Seventh Circuit's decision in *Garrett*, 45 F.3d 1135 (7th Cir. 1995), addressed the

issue directly and provides helpful guidance.  In *Garrett*, where there was no judicial order

directing transportation, the defendant argued that the ten-day transportation period began on the

date his physician recommended that he be returned following his evaluation.  The court rejected

that argument, reasoning:

> it cannot be the case that a physician in the federal prison system
> can initiate the transportation of a prisoner and thereby effect his
> rights under the Speedy Trial Act.  Further, the statute is specific
> as to what triggers the ten day transportation period: the date of an
> order directing such transportation.  Where, as here, there is no
> order, it is the period of transportation that matters for purposes of
> the Speedy Trial Act, and not the time that it took for prison
> administrators to relay the physician's report to the appropriate
> official. . . .  Were it otherwise, the clock could begin running even
> though no official in authority was aware that the prisoner was
> ready to be returned.

*Id*. at 1139-40.  Based on this reasoning, the court held that "where, as here, no order directing

the transportation of a defendant exists, the date upon which the defendant was authorized for

transportation by the appropriate prison official controls the application of § 3161(h)(1)(H) [now

(F)]."  *Id*. at 1140.  In that case, the relevant date was that on which the warden indicated to the

district court that the defendant was ready for transportation.  *Id*.  Citing *Garrett*, the Eight

Circuit reached a similar result in *United States v. McGhee*, 532 F.3d 733 (8th Cir. 2008).  In that

case, the court concluded that the clock started on the date the Bureau of Prisons was notified that the defendant was ready to be returned, rejecting the defendant's argument that the transportation clock started on the date his mental competency report was completed. *Id*. at 738.

In this case, on August 29, 2013, the physician at MCC Chicago advised that Napier's evaluation was complete and that he could be transported back to the Southern District of Ohio. On September 5, 2013, the Marshals Service sought a transportation designation for Napier. Napier began his transportation on September 16, 2013. He arrived in the Southern District of Ohio on September 26, 2013, at which point the transportation period ended and the exclusion relating to a determination of Napier's competency continued.

The Court concludes that in this case, where there was no judicial order directing Defendant's transportation from the competency evaluation, the ten-day transportation period was triggered on September 5, 2013, the date of the Marshals Service's internal order to effect Napier's transportation. This conclusion comports with *Turner*, in which the Sixth Circuit stated, "we still could start the clock at the start of the defendant's trip or on the date of an agency's internal order to transport." *Turner*, 602 F.3d at 785. It also follows the logic of the Seventh Circuit's decision in *Garrett* and the Eighth Circuit's decision in *McGhee*.

Napier's transportation period, therefore, lasted twenty days—from September 6, 2013 through September 26, 2013. The first ten days of the transportation period are excluded pursuant to § 3161(h)(1)(F). Thus, an additional ten days of the speedy trial clock elapsed during that time. The competency determination exclusion resumed when Napier returned to the Southern District of Ohio and continued until his competency hearing of October 2, 2013. The clock has remained tolled since that time for the reasons discussed above.

The following chart summarizes the Court's speedy trial computation in this case:

| Time elapsed on clock | Time tolled on clock | Total elapsed time |
|---|---|---|
| February 7–February 10, 2013 (4 days) | | 4 days |
| | February 11, 2013 (arraignment) | 4 days |
| February 12, 2013 | | 5 days |
| | February 13, 2013 (scheduling conference) | 5 days |
| February 14–February 19, 2013 (6 days) | | 11 days |
| | February 20, 2013 (motion for protective order filed and granted) | 11 days |
| February 21–March 14, 2013 (22 days) | | 33 days |
| | March 15–April 11, 2013 (motion to continue and ends of justice order) | 33 days |
| | April 12–April 29, 2013 (motion regarding competency and order granting motion) | 33 days |
| | April 30–May 9, 2013 (ten days for travel) | 33 days |
| May 10–May 23, 2013 (14 days) | | 47 days |
| | May 24–Sept. 4, 2013 (competency examination) | 47days |
| | Sept. 5, 2013 (agency order to seek designation for travel) | 47 days |
| | Sept. 6–Sept. 15, 2013 (ten days for travel) | 47 days |
| September 16–September 25, 2013 (10 days) | | 57 days |
| | Sept. 26–Oct. 2, 2013 (Def. return to S.D. Ohio, competency determination/finding/arraignment) | 57 days |
| | Oct. 3–Oct. 10, 2013 (ends of justice order) | 57 days |
| | Oct. 11–present (Def. motions) | 57 days |

Accordingly, the Court finds that fifty-seven days of the speedy trial clock have elapsed.[5]

Napier's motion to dismiss the superseding indictment on speedy trial grounds is therefore

DENIED.

### B.   Motion to Dismiss Counts 1–9 of the Superseding Indictment

In this motion, Napier moves to dismiss the production of child pornography counts in

the superseding indictment on the grounds that 18 U.S.C. § 2251(a)[6] is facially invalid as

follows: (1) the statute has no proper nexus to interstate commerce and therefore is not a valid

exercise of Commerce Clause jurisdiction, and (2) the statute is unconstitutionally vague and

overbroad in violation of the Due Process Clause of the Fifth Amendment.   The Government

argues that both contentions lack merit.

### 1.   The Commerce Clause

---

[5] A full calendar that sets forth the speedy trial computation reached in this decision is attached
as Exhibit B to the Government's opposition memorandum, Doc. 57 at Page ID 289–97.

[6] The child pornography statute reads as follows:

> Any person who employs, uses, persuades, induces, entices, or
> coerces any minor to engage in, or who has a minor assist any
> other person to engage in, or who transports any minor in or
> affecting interstate or foreign commerce, or in any Territory or
> Possession of the United States, with the intent that such minor
> engage in, any sexually explicit conduct for the purpose of
> producing any visual depiction of such conduct or for the purpose
> of transmitting a live visual depiction of such conduct, shall be
> punished as provided under subsection (e), if such person knows or
> has reason to know that such visual depiction will be transported
> or transmitted using any means or facility of interstate or foreign
> commerce or in or affecting interstate or foreign commerce or
> mailed, if that visual depiction was produced or transmitted using
> materials that have been mailed, shipped, or transported in or
> affecting interstate or foreign commerce by any means, including
> by computer, or if such visual depiction has actually been
> transported or transmitted using any means or facility of interstate
> or foreign commerce or in or affecting interstate or foreign
> commerce or mailed.

18 U.S.C. § 2251(a).

Congress has the power to regulate interstate commerce under the Commerce Clause. U.S. Const. art. 1, § 8, cl. 3. Napier argues that the production of child pornography statute is not a proper exercise of Commerce Clause jurisdiction because the provision he is challenging—the third clause which permits prosecution of child pornography production when the image "has actually been transported or transmitted using any means or facility of interstate or foreign commerce"—has no temporal relationship to the crime of producing child pornography. 18 U.S.C. § 2251(a). According to Napier, because the transportation of child pornography could occur decades after its production and still fall under the prohibition of the statute, there is no logical nexus between the commission of the offense (production of child pornography) and interstate commerce.

In 2006, the Sixth Circuit rejected an as-applied challenge under the Commerce Clause to the constitutionality of the child pornography production statute. *United States v. Bowers*, 594 F.3d 522 (6th Cir. 2010). In *Bowers*, the court held "that Congress has the ability to regulate wholly intrastate manufacture and possession of child pornography, regardless of whether it was made or possessed for commercial purposes, that it rationally believes, if left unregulated in the aggregate, could work to undermine Congress's ability to regulate the larger interstate commercial activity." *Id*. at 529.

Despite *Bowers'* validation of the child pornography statute under the Commerce Clause, Napier claims to find support for his position in the intervening decision *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012). In *Sebelius*, the Court held that the "individual mandate" in the Affordable Care Act, which required individuals to purchase and maintain health insurance coverage, exceeded Congress's power under the Commerce Clause. *Id*. at 2591. The Court so held after finding that the individual mandate did not regulate existing

commercial activity but instead compelled individuals to become active in commerce by purchasing a product. *Id*. at 2587. The Court rejected the Government's argument that there was no temporal limitation in the Commerce Clause and that uninsured persons subject to the individual mandate would, at some unknown point in the future, engage in a healthcare transaction. Observing that there was no precedent to support a proposition that Congress could "dictate the conduct of an individual today because of prophesied future activity," the Court stated, "we have never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce." *Id*. at 2590.

According to Napier, this principle should apply to invalidate the child pornography production statute because the interstate transportation element of the crime is not temporally linked to the production of the child pornography. He argues that the statute is the epitome of punishing conduct based on prophesied future activity.

The Sixth Circuit has rejected Napier's argument. In *United States v. Rose*, 714 F.3d 362 (6th Cir. 2013), the court held that the child pornography production statute, as applied to a defendant who produced child pornography for noncommercial reasons in his home, did not exceed Congress's power under the Commerce Clause. *Id*. at 371. Like Napier, the defendant in *Rose* argued that the Supreme Court's decision in *Sebelius* called into question whether the child pornography statute was a valid exercise of Commerce Clause power. The Sixth Circuit unequivocally rejected the argument that *Sebelius* called *Bowers* into question:

> The Supreme Court's decision in *Sebelius* did nothing to abrogate its holding in [*Gonzales v. Raich*, 545 U.S. 1 (2005)] that Congress has the power to regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce; therefore, this Court's decision in *Bowers* still controls the issue of the intrastate manufacture and possession of child pornography. The statute at issue in this case, 18 U.S.C. § 2251, does not force into commerce individuals who have

> refrained from commercial activity.  Rose is not a passive
> bystander being forced into commerce, but he is actively engaged
> in an economic class of activities that has traditionally been
> regulated by Congress pursuant to its powers under the Commerce
> Clause.  Rose's expansive reading of *Sebelius* to include stripping
> Congress of its authority to regulate the intrastate manufacture and
> possession of child pornography is inaccurate.

*Rose*, 714 F.3d at 371.

Napier distinguishes his argument from that set forth by the defendant in *Bowers* (and, though he did not discuss it, the defendant in *Rose*) because those cases involved "as applied" Commerce Clause challenges to the child pornography production statute.  Napier asserts a facial challenge to the law.

This distinction does not benefit Napier.  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  That a statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid."  *Id.*

The Sixth Circuit already has ascertained that there are situations in which Congress may validly exercise its Commerce Clause power to prohibit the production of child pornography. *See Bowers,* 594 F.3d at 529; *Rose*, 714 F.3d at 371.  Napier's facial challenge to 18 U.S.C. § 2251 must fail.

## 2. Vagueness/Overbreadth

A statute is void for vagueness "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  Napier contends that the third clause of § 2251, which permits prosecution of child

20

pornography production when the images have "actually been transported or transmitted" in commerce, is unconstitutionally vague. He contends that no reasonable person could predict how, or when, the statute could be violated because it is predicated on prophesied future transportation of images which might be outside the defendant's control.

Defendant's contention is not compelling. The language of the statute is not unclear, and its prohibitions are not difficult to comprehend. Napier does not argue otherwise. Neither does he cites authority in support of his proposition that a statute is unconstitutionally vague if a defendant who engages in conduct that satisfies one element of the statute does not know when facts establishing the other element will be completed.

Defendant next contends that the statute is unconstitutionally overbroad. A statute is overbroad if it affects a "substantial amount" of conduct that is protected by the First Amendment. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). Napier contends that the third clause of the child pornography production statute catches substantially more conduct than is constitutionally permissible because it criminalizes conduct based on transportation of images that may occur years after the defendant produced the images.

The Supreme Court has not recognized an overbreadth doctrine outside the limited context of the First Amendment. *Salerno*, 481 U.S. at 745. Napier does not have a First Amendment right to produce child pornography. *See United States v. Hart*, 635 F.3d 850, 858 (6th Cir. 2011) ("[the defendant] does not have a First Amendment right to attempt to persuade a minor to engage in sexually explicit conduct for the purpose of creating a visual depiction of such conduct."). For this reason, his argument that 18 U.S.C. § 2251 is overbroad fails.

For the foregoing reasons, Defendant's motion to dismiss Counts 1–9 of the superseding indictment is DENIED.

### A.  Motion to Dismiss Indictment

Defendant moves to dismiss the indictment based on violations of his right to due process under the Fifth Amendment and his right to counsel under the Sixth Amendment to the United States Constitution.  The facts relevant to this motion are separate from those already stated, so the Court will relay them here.

### 1.  Facts

On January 16, 2013, the Government filed a criminal complaint against Napier charging him with the production and distribution of child pornography.  The FBI arrested Napier on January 18, 2013.  During his initial appearance in U.S. District Court that day, Napier was appointed a Federal Public Defender.  Napier was detained without bond and held in the custody of the United States Marshal's Service (USMS), which housed him at the Boone County Jail in Burlington, Kentucky.  On February 6, 2013, the Government obtained the indictment against Napier, which charged him with numerous counts including the production, distribution, and receipt of child pornography.

In the meantime, on February 1, 2013, the Assistant United States Attorney (AUSA) assigned to Napier's case contacted Cincinnati Police Detective (CPD) Kelly Best, Personal Crimes Unit, first by email and then by telephone.  On that date, the Cincinnati Police Department opened an investigation of Napier based on the alleged conduct underlying the production of child pornography counts in the Government's case.  This resulted in criminal complaints being filed against Napier in Hamilton County, Ohio, on February 6, 2013.  These complaints charged five counts of sexual conduct by Napier related to two minor victims and relate to the conduct charged in the original federal indictment at counts 1, 4, 7, 11, and 18.

Also on February 6, 2013, the AUSA assigned to Napier's case met with the CPD detective and they discussed that the CPD detective would interview Napier. The AUSA then requested that Napier be moved from the Boone County Jail to the Hamilton County Justice Center. Napier was so transported the morning of February 7, 2013. Napier's attorney was not notified of the request to transfer or the transfer itself.

Upon Napier's arrival at the Hamilton County Justice Center, he was almost immediately brought to an interview room where he was met by two CPD detectives, who conducted an approximately hour and a half interview of Napier. During the course of the interview, Napier requested an attorney approximately seventeen times. Regardless, the officers continued to interview him. As a result, Napier made inculpatory statements to the detectives.

After the interview, Napier was moved to a cell in the Hamilton County Justice Center where he stayed until the next morning, February 8, 2013. On that date, he was removed from his cell and brought to a Hamilton County courtroom for a "bond hearing." However, at the time, Napier was in federal custody, and no writ was obtained from either a state or federal judge in order to secure Napier's appearance for the hearing. Napier was assigned a Hamilton County Public Defender on the morning of February 8, 2013, but that attorney had just a few minutes to meet with Napier before his "bond hearing" and tried unsuccessfully to waive Napier's appearance in court that morning, where media appeared with television cameras. After the "bond hearing," Napier was moved to a new cell where two investigators from the Hamilton County Children's Services arrived to interview him. It was during that interview that the Federal Public Defender learned of the situation and went to the Hamilton County Justice Center to stop the interview.

On February 15, 2013, the Government advised Napier's Federal Public Defender that CPD detectives had interviewed Napier on February 7, 2013 and provided an audio recording of the interview.  The Government subsequently notified Napier that it may use the contents of his inculpatory statements to the officers during the Government's rebuttal at trial.

Napier filed a motion to dismiss the indictment based on these facts on October 11, 2013 (Doc. 54), and the Government filed a memorandum in opposition on October 25, 2013 (Doc. 59).  The matter was argued before the Court on November 12, 2013.  Following that hearing, Napier filed a post-hearing brief on the matter (Doc. 68), to which the Government responded (Doc. 69), and to which Napier replied (Doc. 71).

### 2.  Fifth Amendment Due Process Clause

Napier contends that the above events constituted a serious violation of his right to due process of law under the Fifth Amendment because it violated concepts of fundamental fairness and was shocking to the universal sense of justice.

The Due Process Clause of the Fifth Amendment may require dismissal of criminal charges where the governmental action involved offends fundamental notions of fairness.  For example, the Supreme Court held in *Rochin v. California*, 342 U.S. 165 (1952) that law enforcement officers violated a defendant's right to due process when they forcibly pumped his stomach in order to obtain as evidence two pills he had swallowed.  *Id*. at 172–73.  The Court found that the governmental actions in that case "shock[ed] the conscience" and offended fundamental notions of due process.  *Id*.

The Sixth Circuit likewise has recognized "that outrageous government conduct outside the grand jury process could result in dismissal on due process grounds if such conduct is so outrageous that it violates 'fundamental fairness' or is 'shocking to the universal sense of

justice.'"  *United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)) (but holding there was no basis in the evidence for finding outrageous government conduct).

Napier does not cite to any cases with facts remotely analogous to those here, and the Court cannot conclude based on the precedent before it that the government's conduct in this case—that is, as Defendant describes it, "intentionally participat[ing] in unlawfully transferring Mr. Napier out of federal custody and into state custody, interrogating Mr. Napier without counsel in a willful and egregious violation of *Miranda* and the Sixth Amendment, permitting Mr. Napier to appear at a state court hearing without obtaining the issuance of a writ from this Court or any state court judge, and parading him in front of the media circus that was occurring at the time surrounding this case"—rises to the level of conduct that warrants a dismissal of an indictment.  (Defendant's Motion, Doc. 54 at Page ID 262–63.)

In this case, the AUSA instituted Napier's transfer to Hamilton County so that CPD detectives could interview him and did not advise Napier's appointed attorney of this transfer. This demonstrates poor judgment on the part of the AUSA, as it was certainly foreseeable that an interrogation would take place.  Unquestionably, Napier's counsel should have been notified. Further, that the interview by CPD detectives, the public "bond hearing" in Hamilton County Court, and the attempted interview by Hamilton County Children's Services all occurred while Napier was in federal custody is astonishing, perplexing, and clearly inappropriate.

However, the conduct of the Government in this case is quite different than the conduct of the government in *Rochin*.  There, the key evidence was acquired by "[i]llegally breaking into the privacy of the petitioner," a "struggle to open his mouth and remove what was there," and then "the forcible extraction of his stomach's contents."  342 U.S. at 172.  The Court reasoned

that the Due Process Clause prohibited conviction where the police had used "force so brutal and so offensive to human dignity in securing evidence from a suspect as is revealed by this record." *Id*. at 174.  The constitutional right allegedly violated by the Government in this case was Napier's Sixth Amendment right to counsel.  However, the AUSA was not present during the interrogation during which CPD detectives did not heed Napier's requests for counsel, and she is not responsible for their conduct.  That said, the AUSA's decision to transfer Napier without notifying his counsel laid the groundwork, and the Court will not permit the Government in this case to use any evidence obtained during that February 7, 2013 interview by the CPD detectives for any purpose during the trial of this matter.[7]

Napier also contends that in addition to the pre-interrogation conduct of the government, the government engaged in post-interrogation acts that were shocking to the universal sense of justice.  First, during Napier's arraignment hearing on February 11, 2013, the AUSA told the magistrate that Napier was "erroneously" taken to a state court proceeding of which the government was not "notified."  (T.P. 2/11/13, Doc. 31.)  The AUSA omitted the fact that she had directed Napier's transfer to Hamilton County for the purpose of being interviewed by the CPD detective.

Then, during the pre-trial hearing on February 13, 2013, the AUSA advised this Court that Napier was in Hamilton County "to be processed by the Cincinnati Police Department." (T.P. 2/13/13, Doc. 32.)  Again, the AUSA did not inform the Court that she directed Napier's transfer to the Hamilton County Justice Center so that a CPD detective could interview Napier.

On February 27, 2013, the AUSA provided to Napier's counsel the CPD Investigative Report (presented to the Court during the November 12, 2013 motions hearing as Defense

---

[7] Exclusion of this evidence should not impact the ability of the Government to prove its case against Napier; his indictment is founded on evidence obtained well before February 7, 2013.

Exhibit 1). Napier's counsel suspected that the report contained redactions. He asked for, and received from the Government, another copy of the CPD report on November 6, 2013 (presented to the Court as Defense Exhibit 1A). This copy showed that the AUSA was the complainant on the CPD investigative report on Napier. This copy, however, also contained a redaction. On November 7, 2013, the Government provided defense counsel with a completely unredacted CPD report (presented to the Court as Defense Exhibit 1B). This last version revealed that the CPD detective had written the following in her report's investigative narrative, dated February 1, 2013: "I received an email from [the AUSA] regarding this investigation. [The AUSA] and I spoke on the phone, and she gave me that basic information thus far on James Napier, and their investigation into him." (Def. Ex. 1B.)

Napier contends that these actions by the Government demonstrate that violations of Napier's Fifth and Sixth Amendment rights occurred as a direct result of the AUSA's actions and that the AUSA played an active role in seeking to obfuscate the violation. The Court disagrees. First, that the AUSA discussed Napier's case with a CPD detective is not shocking to the universal sense of justice. In fact, the AUSA has a legal obligation to notify local police when she learns of facts indicating child abuse. *See* 42 U.S.C. § 13031; 28 C.F.R. § 81.2 (2010); *see also* Ohio Rev. Code § 2151.421. Second, that the AUSA initiated a transfer of a defendant without advising the Court or opposing counsel is extraordinary, and it is a practice that the Court orders the Government to abandon. However, there is nothing in the record to indicate that the AUSA took part in any decision to deprive Napier of his right to counsel during his interview with the CPD detectives. Finally, it is unclear to the Court why the Government redacted portions of the CPD's investigative report on Napier. The redactions were needless and, clearly, engendered distrust and animosity on the part of the Federal Public Defender. That

said, the Government's actions, while amounting to poor judgment and questionable civility, do not amount to conduct that "is so outrageous that it violates 'fundamental fairness' or is 'shocking to the universal sense of justice.'"  *Allen*, 619 F.3d at 525.

Napier was returned to Boone County Jail on February 11, 2013 at his attorney's request. Barring the Government from using in this case any evidence obtained against Napier during the time he was detained at the Hamilton County Justice Center will restore the fairness to these proceedings.  Counsel must restore civility to the bar.

### 3.  Sixth Amendment Right to Counsel

Separately, Napier urges the Court to dismiss the indictment as a remedy for the Sixth Amendment violation that allegedly occurred while he was interrogated by Cincinnati Police officers.  As support, he cites *United States v. Clark*, 319 F. App'x 395 (6th Cir. 2009) for the proposition that dismissal of an indictment may be an appropriate remedy for a deliberate infringement of the right to counsel if there is "*demonstrable* prejudice, or substantial threat thereof."  *Id*. at 399–400 (quoting *United States v. Morrison*, 449 U.S. 361, 365 (1981)). However, neither *Clark* nor *Morrison* held that dismissal of an indictment is the necessary remedy for a Sixth Amendment violation if there is the substantial threat of demonstrable prejudice.  Rather, what *Morrison* held, and what *Clark* referred to, was that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate."  *Morrison*, 449 U.S. at 365. The Court went on to state that "[t]he remedy in the criminal proceeding is limited to denying the prosecution the fruits of its transgression."  *Id*.

The Court already has determined that the Government will not be permitted to use as evidence the statements Napier made to the Cincinnati Police during their interview of him on

February 7, 2013 for any purpose at trial, including as rebuttal evidence.  This is an adequate remedy for the alleged Sixth Amendment violation here.[8]  Additionally, this remedy eliminates any substantial threat of prejudice in this case.  Accordingly, Defendant's motion to dismiss the indictment is DENIED.

### III. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion for Severance of Counts 2–9 of the Superseding Indictment (Doc. 51), Motion to Dismiss Indictment Pursuant to the Speedy Trial Act (Doc. 52), Motion to Dismiss Counts 1–9 of the Superseding Indictment (Doc. 53), and Motion to Dismiss Indictment (Doc. 54).


IT IS SO ORDERED.


___s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court

---

[8] The Government disputes that Napier suffered a clear violation of his Sixth Amendment rights. This Court need not explore the merits of that contention.  This Court's decision to prohibit the Government from using the statements obtained by the Cincinnati Police is based on the totality of the circumstances set forth in Napier's motion to dismiss the indictment.